UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITIZENS BANKING CORPORATION,

        Plaintiff,

                                                                       Case No. 03-CV-74044
vs.                                                     04-CV-70459

                                                           HON. GEORGE CARAM STEEH

GULF INSURANCE COMPANY,

        Defendant,
_____/

OPINION AND ORDER DENYING DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT (CASE NO. 03-CV-74044: DOCUMENT NO. 45 AND CASE NO. 04-CV-70459: DOCUMENT NO. 31) AND DENYING WITHOUT PREJUDICE DEFENDANT'S MOTIONS TO STRIKE (CASE NO. 03-CV-74044: DOCUMENT NO. 51 AND CASE NO. 04-CV-70459: DOCUMENT NO. 37)

This opinion and order of the court will address Defendant Gulf Insurance Company's ("Gulf") motions to strike and motions for summary judgment in two separate cases involving the same parties. A hearing was held on the motions for summary judgment on July 7, 2005. The motions for summary judgment are DENIED for the reasons set forth below. Defendant's motions to strike are DENIED WITHOUT PREJUDICE, as noted below.

**I. BACKGROUND**

These related causes of action for breach of contract arise from the denial of two separate claims under an insurance policy owned by Plaintiff and issued by the Defendant[1]. Plaintiff Citizens Banking Corporation ("Bank") was insured by a fidelity

---

[1] Plaintiff's complaint alleges two counts. Count I is for breach of contract while Count II is a state of Michigan statutory cause of action for failure to pay an insurance

bond issued by Gulf in 1999. In May of 1999, while renegotiating the terms of the original bond, Gulf was presented with a proposed rider, now known as Rider 19. Rider 19 was intended to provide coverage to the bank for detrimental reliance on false and fraudulent finance documentation provided by its borrowers. While Rider 19 was originally submitted to Gulf through the bank's insurance broker, J & H Marsh & McClennan ("Marsh"), it is unclear who penned the language of the rider[2]. No other fidelity bond issued by Gulf, or any other insurance company, is known to contain a rider of similar language. Rider 19 was accepted by both the Bank and Gulf after some minor changes[3]. The fidelity bond was renewed several times, most recently on June 1, 2002, and each renewal of the bond included Rider 19.

The relevant language of Rider 19 is as follows:

"To be attached to and form part of Financial Institution Bond, Standard Form No. 24, No. GA0722413, in favor of Citizens Banking Corporation.

It is agreed that:

1. The attached bond is amended by adding an additional Insuring Agreement as follows:

---

claim in a timely manner. Because the success of Count II is wholly dependent upon the success of Count I, this order denying summary judgment only explicitly refers to the breach of contract cause of action.

[2] There is evidence that indicates Rider 19 originates from an unrelated insurance agreement brokered by Marsh on behalf of another of its clients, General Motors.

[3] The record shows that representatives of Gulf and the Bank discussed the contents of Rider 19 during a day long meeting in May of 1999. However, there is no evidence that the parties discussed the specific meanings of the portions of Rider 19 which are now in dispute. Additionally, the minor changes which were apparently made to the original text of Rider 19 during this day long meeting have no implications on the outcome of this cause of action.

Insuring Agreement (I)- Forged and Fraudulent Finance Documentation Coverage
The Underwriter shall be liable for direct loss resulting from the Insured having materially relied on any original Finance Documentation in the extension of credit in which such Finance Documentation:

    a. bears a Forgery of any person signing in an official capacity, or
    b. has been fraudulently materially altered, or
    c. is a fictitious representation of assets,

For purposes of this Insuring Clause:

1. Actual physical possession of the **original Finance Documentation** (emphasis added) by the Insured prior to having acted thereupon is a condition precedent to any claim being made.

2. Finance Documentation shall mean documents that are materially relied upon by the Insured in the extension of credit for which documents the Insured has **standard written procedures to physically verify the existence of the underlying property** (emphasis added) but does not mean any documents where the Insured cannot establish that they exercise verification procedures,

3. Loss does not include any loss or claim resulting from any negligent act, or error, or omission by the Insured, including the failure to satisfy the legal procedures which are required to complete an effective transfer to the Insured of any accounts receivable or inventory."

Essentially, Rider 19 insures against losses resulting from fraudulent financial documentation submitted by a borrower and relied upon by the Bank. However, in order for documents to be classified as financial documentation, the bank must have had standard written procedures in place to verify the existence of the collateral the documents purported to represent and the bank must have actually exercised said procedures. Furthermore, Rider 19 indicates that actual possession of the *original* financial documentation is a condition precedent to any claim of coverage.

      Shortly after the fidelity bond was renewed in June of 2002, the Bank discovered that two of its corporate borrowers, KMS Energy (KMS) and Advance Industries (Advance), had defaulted on substantial portions of loans. The current causes of action

3

by the Bank result from Gulf's denial of the Bank's claims issued in response to the aforementioned defaults. The dispute specifically involves whether the Bank can demonstrate that it fulfilled the requirements of Rider 19 in order for its losses to be covered by the fidelity bond.

### The Lending Relationship Between the Bank and KMS

About April of 2002, the Bank entered into discussions with KMS about a potential lending agreement. While attempting to determine KMS's eligibility for the requested loan, the Bank obtained three audits, which were independently conducted by Navarro, Elisco and O'Connell, for the years ending December 31 of 1999, 2000, and 2001. The bank ultimately decided to enter into a lending agreement with KMS, by which the loans to the company would be secured by their accounts receivables. Specifically, the line of credit extended to KMS was determined through a formula in which they were able to borrow up to 75% of the total value of their accounts receivables. In quantifying KMS's line of credit, no accounts receivables older than 120 days were to be considered in the borrowing base. In order to calculate the line of credit, KMS was required to submit two bi-monthly financial statements: Borrowing Base Certificates ("BBCs"), and Aged Trial Balances ("ATBs"). These documents were signed by employees of KMS warranting their authenticity. KMS was also required to enter into a "lockbox agreement" by which the receivables securing the loan were sent by KMS's customers directly to the bank to pay down the line of credit. Furthermore, the Bank conducted several site visits to KMS during which employees of the Bank attempted to observe the business operations of the company.

The initial loan disbursement to KMS was issued on June 25, 2002 in an amount of $8,059,433.65. On August 12, 2002, the bank increased the credit limit to $9,500,000. On October 11, 2002, the credit limit was once again increased to $11,400,000. Sometime thereafter, the Bank discovered that the collateral (receivables) used to secure the KMS line of credit did not exist, and the BBCs and ATBs were fraudulent and inaccurate expressions of KMS's available assets.  KMS subsequently defaulted on the loans, and the Bank suffered a net loss of $8,243,940.71.

On or about August 1, 2003, the Bank submitted a proof of loss to Gulf. Because Gulf failed to address the claim within 60 days, the Bank filed suit for breach of contract on October 6, 2003. Gulf formally denied the Bank's claim for the KMS loss on February 6, 2004.

### The Lending Relationship Between the Bank and Advance

The Bank's lending relationship with Advance and its predecessors began in 1999. Similar to the relationship with KMS, Advance was given an initial line of credit which was later adjusted based on available assets in the Advance accounts receivables and inventory. Although the Bank did not commission an independent audit of Advance prior to engaging in the loan agreement, employees of the Bank conducted two field exams. These field exams were conducted by Bank personnel and included interviewing  Advance employees to ascertain the inventory procedures used by the company. Also, the loan agreement, in this instance, required Advance to submit warranted bi-monthly BBCs and ATBs representing the companies accounts recievables and inventory, which were used in determining the available borrowing

5

base. Advance was typically permitted to borrow up to 75% of the amount available in their accounts receivable, and up to 50% of the value of their total inventory.

The initial loan disbursement was made to Advance in July of 1999, and was in the amount of $2,256,829.47. Eventually, the credit extended to Advance totaled over $11,000,000. It is unclear at this juncture how the loss in the Advance loan was discovered[4]. After Advance defaulted on its loan, its principal officer committed suicide.

The Bank suffered a net loss in the Advance default of $9,168, 887.18. The Bank filed its proof of loss with Gulf on September 9, 2003. Like the claim for the KMS default, the claim for the Advance default was denied by Gulf on February 6, 2004.

## II. MOTION FOR SUMMARY JUDGMENT

Gulf asserts that summary judgment is proper in these two causes of action as a result of the Bank's failure to satisfy the requirements of Rider 19 of the fidelity bond. Specifically, Gulf asserts that the BBCs and ATBs relied upon by the bank do not constitute financial documentation as defined in Rider 19 because the bank did not have in place the requisite "standard written procedures to physically verify the existence of the underlying property" , and, in the alternative, the bank did not exercise any standard written procedures that may have existed. Furthermore, Gulf asserts that coverage cannot be extended under Rider 19 to the KMS and Advance loans because the vast majority of the BBCs and ATBs relied upon by the Bank were photocopies, e-mails and

---

[4] The parties appear to disagree as to whether the loss in the Advance case was discovered before or after the Bank hired the auditing firm of Ianuzzi and Darling to conduct an independent inventory audit. While Gulf has asserted that the independent audit was not commissioned until after the loss was discovered, the Bank has asserted that this audit resulted in the discovery of the loss. The lack of clarity on this matter has no effect on the court's ruling on the motion for summary judgment.

facsimiles. Such documents, in Gulf's view, do not constitute "originals" as required by the language of Rider 19. In opposing Gulf's motions for summary judgment, the Bank relies on a number of expert reports, depositions, affidavits and other relevant documents[5].

## Standard

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

---

[5] Among the evidence relied upon by the Bank in its opposition to this motion is the affidavit of Thomas Shafer, the expert reports of Logue and McNamee, and attachments 24 and 29 of the reply brief. These pieces of evidence are the focus of a motion to strike filed by Gulf, pursuant to rule 12(f) of the Federal Rules of Civil Procedure. During the hearing for the summary judgment motion, Gulf stated that the motions to strike were primarily filed in order to preserve the objection for the record. The court finds that oral arguments on the motions to strike are not necessary. E.D. Mich. LR 7.1(e)(2). The court denies the motions to strike without prejudice. As a result, the evidence submitted by the Bank was considered for the purposes of the summary judgment motions. Furthermore, the court notes that rule 12(f) is designed to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter". Fed. R. Civ. P. 12(f). The evidence in question does not constitute a pleading as described in that rule providing for a motion to strike.

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences therefrom must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## **Analysis**

In order to grant Gulf's motions for summary judgment, the court must find that the language of Rider 19 creates clear requirements which were not fulfilled by the Bank throughout its relationships with KMS and Advance. The court cannot render such a holding because Rider 19 includes two separate ambiguous phrases, creating genuine issues of material fact to be decided by a jury. Specifically, the court finds the phrases "physically verify the existence of the underlying property" and "actual physical possession of the original Finance Documentation" are ambiguous. The meaning of these phrases must be found by a jury and not by this court.

### **The phrase "physically verify the existence of the underlying property" is ambiguous and presents questions of fact to be decided by a jury**

In order for a term of a contract to be declared ambiguous by the court, the term must be "reasonably and fairly susceptible to multiple understandings and meanings." Equitable Life Assurance Soc'y v. Poe, 143 F.3d 1013, 1016 (6th Cir. 1998). When the court declares a term to be ambiguous, the meaning of the term becomes an issue of fact to be decided by a jury. Klapp v. United Insurance Group, 468 Mich. 459 (2003). Therefore, if a court concludes that a term can reasonably be interpreted in a number of ways, it is the responsibility of the jury to decide which of those interpretations should be applied.

When the two parties agreed to attach Rider 19 to the pre-existing fidelity bond, they chose to not provide a definition of the term "physically verify" in the text of that rider. Furthermore, no evidence is presented by either party that indicates the phrase "physically verify" has an unambiguous meaning when used in relation to the banking

industry and lending practices. In fact, as previously mentioned, there is evidence that the phrase "physically verify" has never been used in a bank document in the context of receivables. The court may not define these terms as a matter of law for the two parties signing this contract. When there are ambiguous terms in a contract, those terms are typically construed against the party that drafted the document.  Herweyer v. Clark Hwy. Services, Inc., 455 Mich. 14, 22, 564 N.W.2d 857 (1997). However, the evidence shows that neither party was responsible for drafting the language of Rider 19[6]. Thus, when analyzing the phrase "physically verify" in a neutral light, the court finds the term to have no clear meaning.

Gulf asserts that the phrase "physically verify" can only be interpreted to mean a process in which all financial documentation is "circularized". This process would involve verifying a borrower's accounts receivables with that borrower's account debtors. While it is possible that Rider 19's requirement to "physically verify" would be satisfied by circularization, there is no evidence that it can *only* be satisfied by circularization. The Bank points to several expert reports, along with an affidavit submitted by Bank president Thomas Shafer and the testimony of Gulf's own employees, to demonstrate that the phrase "physically verify" does not necessarily translate to "circularize". The Bank provides this court with seven separate proposed definitions of the term "physically verify"[7]. While the court does not today decide which of these definitions are

---

[6]Rider 19 was apparently drafted by Marsh, the insurance broker. Because there is no evidence that clearly demonstrates that Marsh was acting as the agent of either Gulf or the Bank, the court will not attribute the actions of Marsh to either party.

[7]The Bank contends that it satisfied six of these definitions and "physically verified" the accounts receivables in the KMS case and the accounts receivables and

most persuasive, it can certainly be said that a number of the definitions could be accepted by a reasonable jury. Because several of the Bank's proposed definitions of the term "physically verify" could be accepted by a reasonable jury, the court must conclude that the term is susceptible to several meanings, thus creating an ambiguity and a question of fact for the jury.

### The phrase "original finance documentation" is ambiguous and presents a question of fact to be decided by a jury

Gulf also asserts, as a matter of law, that the Bank's losses are not covered by Rider 19 because the financial documentation relied upon largely consisted of e-mails and facsimiles. These documents, according to Gulf, are not "original" as required by Rider 19. Gulf asserts that Rider 19 requires the documents relied upon to be "wet ink" originals and not mere representations of originals. As a result, Gulf asks the court to dismiss all portions of the Bank's claims as they relate to any relied upon documents which are not originals[8].

The meaning of the word "original", when used in a contract, is not a matter for which much legal precedent exists. The cases cited by both parties in support of their positions are distinguishable from the matter at hand and do not indicate to this court that there is a settled legal definition for the word "original" when considered in the context of this dispute. While Gulf asserts that original means the document needs to be

---

inventory in the Advance case.

[8] The Bank asserts that Gulf grossly exaggerates the number of documents that are not "wet-ink" originals. Furthermore, it is not clear to this court how Gulf would separate the losses that resulted from reliance on the "wet-ink" originals from the losses that resulted from reliance on e-mails and facsimiles.

"wet-ink", the Bank asserts that the court should adopt the definition of original as found in the federal rules of evidence. This court is not prepared to apply either definition to the term.  At this juncture a fact finder could conclude either of the conflicting definitions to be reasonable. As a result, it is this court's view that the word "original", as found in Rider 19, is ambiguous. The meaning of "original" must be determined by a fact-finder, who can then apply the definition to the facts of this case to determine whether or not the Bank  fulfilled the condition precedent of Rider 19.

## **Conclusion**

The court is unable to grant summary judgment in a breach of contract cause of action when the language of the contract is ambiguous to the extent that the court is not able to understand the relevant language and terms of the document. In both of the cases the court has addressed in this order, Plaintiff's cause of action is dependent upon the meaning of Rider 19. Because the phrases "physically verify" and "original finance documentation" are susceptible to multiple definitions and meanings, the court finds these phrases to be ambiguous. As a result, genuine issues of material fact exist to be decided by a jury. Accordingly, Defendant's motions for summary judgment are DENIED. The court has scheduled a hearing for Defendant's motion to consolidate for

Thursday, September 8th at 2:00 p.m. The court will hold status conference(s) immediately following the hearing.

IT IS SO ORDERED.

                              s/George Caram Steeh
                              GEORGE CARAM STEEH
                              UNITED STATES DISTRICT JUDGE

Dated: August 10, 2005

## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record on August 10, 2005, by electronic and/or ordinary mail.

                              s/Josephine Chaffee
                              Secretary/Deputy Clerk